Good morning, your honors. If it pleases the court, this is Ed Haug for the appellant Baxalta, and we are asking for the judgment of infringement of the 520 patent to be reversed because of for at least two reasons. We also ask that if the claim construction survives this appeal, then the 520 patent is invalid for lack of enablement as to non-random licensing conjugation. And if the court were to find enough to disturb the infringement or validity rulings, then we also are appealing the damage award, which we think as a matter of law was erroneous and should be vacated. So with that, I'd like to start, of course, with the claim construction, which as I said, I think is wrong for at least two reasons. The district court construed the claim, the operative element of the claim to require a polypeptide conjugate where the conjugation was not random. The word random does not appear in the claim. It only appears in the claim construction. However, that was the result of the specification, which we believe clearly teaches away from random pegulation by lysines and also a disclaimer during the file history in which the patentee or the applicant clearly disclaimed any conjugation with reactive groups where it is a random, namely amine or lysines, and does not ensure that attachment occurs at the B domain. And I'm referring to their appeal brief, which is cited throughout our brief. And so the disclaimer was found by the court. That was not appealed by Bayer here. So there is a disclaimer. And between the disclaimer and the specification itself, we believe that the claim construction should have been so as to exclude conjugation at amines and lysines. And then further, what also happened here is because the parties did not agree on what random might mean, and this is in response to direct questions from the court during Markman, Bayer said it's susceptible to many meanings. We gave our definition of random, which was excluding conjugation at amines or lysines. The court did not adopt either one of those or any of those definitions, but just used the words not random in its claim construction. And later in the case, before trial, we asked the court to clarify or construe what it meant by not random. It was clear that there was a dispute between the parties going into trial, and the court refrained and declined our request to construe what it meant by not random. And as a result, we went to trial where both sides were arguing to a jury whether the adinovate, the accused product here, was random or not in its conjugation. And each side had a different version of what it believed not random meant. And the court was clear in its claim construction during trial that the only construction is the construction that it gave in its order of July 5, 2018, and that that was the sole extent of the construction. And so it's a classic case, I believe, of pre-Markman, where the litigants went to the jury and each argued what an important key feature of the claim meant, and they left it up to the jury to make its decision on whether or not there was infringement or validity. Mr. Howe, this is Judge Lynn. I understand from the prosecution history where the disclaimer of random conjugation originated, but I don't find anywhere that suggests that the disclaimer goes as far as you would request that for a disclaimer of lysine conjugation. Can you help me on that? Certainly. Yes, Judge Lynn. So in the disclaimer, which appears at Appendix 4599, that's the appeal brief excerpt where it talks about Claim 58, which becomes Claim 1 in the patent, they're distinguishing over the prior art, which is the B-domain, and they're distinguishing over that by saying much of the Patent Office's prior arguments relied upon possible conjugation at amines or carboxy sites, which are present not only in the B-domain, but in other domains. That is the Bossert reference. Any conjugation with these reactive groups, namely the amine or carboxy sites, is random and does not ensure that it is very, very clear that they are here disclaiming conjugation with reactive groups such as amines or carboxy sites, which are random. And that's what they're distinguishing over here in the disclaimer portion of the file history. And that is entirely consistent with the disclosure in the patent, such as at Column 3 to Column 4, where they talk about random modification of problems associated with lysine conjugation of Factor VIII, which has to be random because there are 158 sites in Factor VIII, 158 lysine sites, both within the B-domain and outside the B-domain, and there is no way to pegolate to any one particular site, and that's why it's random. And what they distinguished over was what is disclosed in the patent, which is cysteine pegolation, which is site-specific, meaning that the conjugation will always be at that particular site, which is in the B-domain, only one site. And that's the only way to retain functional Factor VIII activity, which is another requirement in the claim as part of the claim construction. And so this whole argument about the disclaimer and the disclosure in the patent also goes to the non-enablement issue, to the non-enablement issue, because there's simply nothing in the disclosure here in the intrinsic record that tells a person of ordinary skill in the art how you could possibly conjugate amines or lysines in a non-random way. Indeed, it teaches away from that and says you can't, and that's what they're distinguishing over. It's the point of novelty, really, to this whole patent. And so if the claim construction as it sits now, putting aside the problem of not even really knowing what is meant by not random in the court's claim construction, if that claim construction is left to be so broad as to include lysine conjugation, it's invalid for lack of enablement. There's nothing, the examples are all to cysteine pegylation. There's nothing in the description other than as I pointed out in the background where they're teaching away from lysine conjugation. And as I go back to my original point on where we were left with with the jury is the whole trial became whether we're talking about a random process or a non-random process, but we were using different views of what random and not random meant. And that's legal error. The court, I think, was obligated to make that clear to the parties, but more importantly to the jury. And that didn't happen in this case. And I also point to the spec again at column three, line 50, to column four, lines, I think, line 20, lysine is much, lysine conjugation is much more problematical. That is what they were distinguishing over in the prior art, in their disclaimer, and in the rest of the intrinsic record. And as I said, unfortunately, we saw this problem brewing before the trial and asked the court to help and construe what it meant by its construction effectively. And we were unable to get that clarification. And that carried through the trial. I hope I answered your question, Jeswin. Yes, although I have a follow-up. Is there any way to assure conjugation focused on the B domain other than to restrict lysine conjugation? In other words, does conjugation have to be focused on cysteines in order to focus on or target the B domain? I think the answer is yes, based on the intrinsic record, based on what this patent says in its descriptions and all of the examples in the patent. There are other-obviously there are other amino acids that are in factor VIII, but this patent is only really talking about site-specific cysteine, which is the only one that is shown to work. Counsel, this is Judge Stoll. Did the jury hear any expert testimony that would be contrary to what you just said? That is, did the jury hear any expert testimony about how lysine pegylation could be targeted to the B area? Sorry, I'm forgetting the name of it. I apologize. B domain? The B domain, Judge Stoll? Well, the experts were not permitted to talk at all about pain construction. There was an explicit direction from the trial judge not to allow the witnesses to talk about- But this is a factual issue, isn't it? I mean, this is like an underlying factual issue that might go to enablement as well. And so, could you just answer my question before you tell me why it doesn't matter? It was an answer to a question. Expert testimony or not? I think the answer is no. Okay. Thank you. All right. Let's hear from the other side. In fact, I'd like to hear Mr. Batke's view on this same question. Mr. Batke. Thank you, Your Honor. May it please the court. In answer, I think, to Judge Stoll's question, there was extensive expert testimony on pegylation and in addition to that, there was extensive evidence or the experts and fact witnesses talked about numerous admissions to the FDA, including testimony that went to controlled targeted pegylation at the B-domain. Predominantly, their product, the Dynovate, pegylated at the B-domain, 73% of factor VIII and Dynovate pegylated in the B-domain. Judge Andrews found this on the J-mall. He said that there was substantial evidence in the record, including the FDA admissions. And so, the experts spoke about this. It is a question. The jury came out squarely against them. So, Judge Stoll, I don't know if that answers your question, but the evidence was extensive. Do you have any particular sites you'd like to share with the court? All right. Mr. Batke, I only heard the first half, first part of what you were saying. I'm sorry, Your Honor. I'm not sure where you dropped off. What I was saying is that there was extensive expert testimony about the pegylation of lysines at the B-domain, which was supported in substantial part by FDA admissions. And there were numerous FDA admissions to that effect, including they told the FDA that the B-domain was a hotspot, that there was controlled targeted addition of PEG, which is the opposite of random pegylation. There was an FDA document that 73 percent of factor VIII and adenovate is pegylated in the B-domain, that pegylation was predominantly in the B-domain. And, in fact, the FDA, in an early meeting in 2009 with Baxalta, actually told Baxalta that your active molecules are those that are pegylated in the B-domain. We give those sites extensively. We cite to all of instances in our brief, including, I can tell you, the 73 percent of PEG attachment sites in the B-domain is at Appendix 37076. The controlled targeted chemical addition in the B-domain is at Appendix 37076. So, there was extensive evidence to that effect, and there was really no question. The evidence at trial was really rather overwhelming with respect to the amount of pegylation in the B-domain. The jury also heard from one of our experts, Dr. Plough, and we do cite this in our brief, about how all they needed to do was optimize some pegylation conditions to favor pegylation at the B-domain. And that testimony would be from Dr. Plough at Appendix 654 to 71. They did very little. Once they learned the novel aspect of the claims, which was nonrandom pegylation at the B-domain, it was very easy for them to proceed and to center pegylation in the B-domain. If there's no other questions on that, I'll turn next to claim construction. Mr. Baskin, this is Judge Lynn. How would you isolate or target to the B-domain without eliminating conjugation of lysine? Well, what you do is, if your Honor takes a look at Appendix 654 to 71, that's the testimony of Dr. Plough, there are certain reaction conditions that are performed in every pegylation reaction. One of them is the inclusion of calcium. Another one is you adjust pH. Another one is you consider the ratio of peg to factor VIII. And then the fourth one is plunging. In other words, when do you stop the reaction? And so, if you take a look at his testimony, he references an exhibit that was before the jury, PTX446. That was a document submitted to the FDA. And there, Baxalta told the FDA what they had to do with respect to those four specific reaction conditions to achieve B-domain pegylation. And I'll take one as an example, calcium. They just increased the number of calcium. And what that does, and this was known as early as 1990, 15 years before the application was filed. What calcium does with factor VIII is it exposes the tail-like structure of the B-domain so that it's more available for pegylation. They adjust the pH so that lysines are more reactive. And then they just had a couple of runs in their optimizing of the amount of peg to factor VIII. And then they just quenched it after the B-domain was relatively full of the pegs. And so, that's all they did. I would put that in the category of optimizing rather than experimenting. So, in other words, it's not just the amino acids. It's the overall conditions under which the ultimate result, right? Well, I would say that's partially true. The conditions that are present in a lysine reaction are the same conditions, category of conditions, that are available in a cysteine reaction. It's just you may need to optimize them with a lysine in order to direct the peg to the factor VIII. So, the reaction conditions are the same. It's not like they needed to introduce some new type of reaction condition. It's the same reaction conditions. The processes are substantially similar. All right. What I'm trying to get at is the extent to which the prosecution history we discussed a minute ago appendix page 4599, in clearly disavowing random pegylation, is or is not also a disclaimer of lysine pegylation? Well, I mean, one reason, Your Honor, is that the prior art that was and pegylation at arginine. And you can take a look at Baer's appeal brief, which was on page 3507, where Baer was responding to the examiner's rejection. And there was a reference there to the fact that lysine, cysteines, and arginine were in the prior art. So, it could not have been the case that Baer also disclaimed lysine pegylation. But if you take a look throughout the prosecution history, you can see that consistently Baer was distinguishing random pegylation and not lysine pegylation. What's your understanding of random? Well, I think that Mr. Howe doesn't point out that in his opening, he actually gave the jury what that means. He said random means you don't know where it's going. And if you can't find a target or can't hit a target, it's random. The jury here heard plenty of evidence about the target being hit. And in fact, that's a word that was in their FDA documents. But that meaning was known throughout the trial. The experts and the witnesses basically had all of the same understanding. One of their star witnesses, Dr. Bossard, said pegs just go everywhere. One of our inventors, Dr. Murphy, said you're not sure where peg is going. Dr. Pla, one of our experts said pegylation without regard to location. There was no confusion as to what the word random meant. And indeed, Baxalta, they were pushing this construction of amine pegylation. If you pegylate with amines, it means that it is random. But they dropped that before they got to trial. And then Mr. Howe gave this new definition, which was random means you don't know where it's going. And now on appeal, they're now arguing a different meaning for the term, which is that conjugation occurs at multiple amino acid sites. So they've been inconsistent in what they've been urging the district court to do, but now they're blaming the district court for not adopting a definition of random. And in fact, the district court specifically opened the door to define that term at the charge conference. And this is on appendix 1594 to 1598. Mr. Howe told the district court three times that he did not want to add anything to the claim construction. And so it's too late at this point for Baxalta to be coming in now and seeking to reverse a jury determination and send it back to the district court after he told the district court before the case went to the jury that no more claim construction is necessary. So obviously they made a strategic decision on that and they should be required to live with it. So if there's any other questions on that, I think I have a couple more minutes. One thing I wanted to add about enablement, because Mr. Howe brought up enablement, is that there really was no case put on on enablement. And clearly we did not have an obligation to respond to a case that was not made at trial. There was some conclusory testimony. But as we know, that can't carry the burden under Alcon, Amgen, Herx, Cephalon, and Streck. And in fact, they didn't even make a threshold showing that any experimentation is needed. So we don't even get to the WANS factors. And not that the optimizing of the conditions, as I just explained, even suggested experimentation was necessary because that does not rise to the level of experimentation. But in any event, they did not carry their burden. I just want to say one thing. I guess I should move on to willfulness. We did cross appeal on willfulness. And that's a classic willfulness story. It should have been permitted to go to the jury. The jury was aware that Nectar knew that Bayer was developing the Factor VIII product, so there were prior business dealings. Their random pegylation project when they later worked for Bexalta was failing. They knew of Bayer's patent application, both Bexalta and Nectar. They knew about the patent when it issued. And in fact, as early as 2011, the claim that was pending in the patent office was substantially the same claim as in the patent. Significantly, what the district court did is it excluded a poster, which was a description of the B-domain pegylated invention by Bayer, which was made at a public gathering. Bexalta scientists were present. On this poster was significant information, including some charts showing the retention of activity if you pegylate in the B-domain, which was a revolutionary concept at the time. And within a very short period of time, that information was circulated to scientists at Bexalta. Shortly thereafter, they dropped their random pegylation program with Nectar and turned to pegylating B-domain. And within a very short time after that, they were at the FDA already with work having been done on pegylating B-domain. So that evidence that was excluded was significant, and we should have been able to run with it, and the case should not have been taken from the jury. So, with that, I'll let the panel, if it has any questions. Okay, any questions from the panel at the moment? No, thank you. All right, thank you. Then we'll hear from Mr. Howe. Okay, Mr. Howe, are you ready? Yes, Your Honor. Sorry, I think we had a problem with the communication. I would like to start. Mr. Batke talked about the reaction conditions being similar between cysteine and lysine conjugation. There's absolutely nothing in the patent about reaction conditions, certainly not as to lysine pegylation. And so, we have to stay with the patent. That goes both to claim construction as well as to the enablement issues. The processes are in no way the same or even close to being similar. Cysteine pegylation allows site-specific non-random conjugation, whereas lysine does not, as they disclaimed in that prosecution. In response to the question from Judge Lynn, the relevant portion from Appendix 4599, the appeal brief by Bayer, it's not talking about cysteines or arginines or anything else. It's very clearly talking about possible conjugation at amines or carboxy sites. And these reactive groups result in random conjugation and cannot or does not ensure attachment at the B-domain. It couldn't be clearer. It is very clear and, as I said earlier, completely consistent with the specification. Mr. Batke also talked about some of the expert testimony here. The expert for Baxhalta, Dr. Zalipsky, said it was not possible to pegylate lysine non-randomly. Full stop. It's just not possible to do. But more than that, the inventors, and this goes to enablement as well as claim construction, but really enablement, the inventors themselves, there were two inventors who testified at this trial. It was Dr. Murphy and Dr. Pan, who was the lead inventor, and also he wrote the patent application. And this is in our brief at 54. Dr. Pan was asked, did you ever consider lysine pegylation as an option for meeting the goals of the KGM project? Answer, I didn't think it was possible. Question, why is it you never used lysine pegylation? Answer, well, if you look at a lot of what I wrote in the proposal background and also a lot of that in the patent application, I really never thought, especially for factor VIII, such a complex protein with so many lysines, it would not be a feasible way to make that work. And then Dr. Murphy was also asked, question, there is no data in here, the patent, that shows lysine pegylation at the B domain. Is there? Answer, there is no data in this patent. Right. So yes, we do not have data that shows lysine pegylation in this patent. It goes on, question, is there anything in this patent that you're aware of that talks about pegylating lysines in a non-random way? Answer, not in this patent. The testimony could not have been clearer from the two inventors of this patent. The expert, at least on the Max Salta side, said it was consistent. It wasn't even possible to do. And I also would point to the argument from Mr. Batke about Adinovate, which is the accused product again, and what Adinovate did or didn't do as far as targeting the B domain, for example. There was legal error here in the judge's Jmol decision, where when he denied the Jmol on lack of enablement, he relied on Adinovate itself as showing you could do lysine non-random pegylation based on what the jury had found. However, Adinovate only came into existence many years after the critical date of the patent. It's not legally relevant and shouldn't have been considered at all. And so that was also legal error, I believe, in trying to find a basis for the enablement finding. And I would like to at least mention in the one minute or so I have left on the damages, our brief, I think the brief very, very clearly goes through what happened in the damages. However, I would summarize our position in part to say what happened here is the expert had an opinion before trial of one reasonable royalty, a single reasonable royalty. That opinion was excluded on a Daubert motion. But the rest of his analysis was allowed to come in. And the opinion went from one reasonable royalty, which the expert was not allowed to testify about, to saying that the jury could just pick, speculate, pick any royalty between five and 42%. And it was clear legal error to permit the jury to speculate in that regard. And as I said, I think our briefing goes through that in much detail and cites to the record and I'm sure your honors will appreciate the argument from reading those briefs. Thank you, Mr. Haug. You've raised a new issue and I'm going to give Mr. Bakke a couple of minutes to respond since you hadn't mentioned the damages aspect in your argument. Does the panel have any more questions for Mr. Haug? No, thank you. No, thank you. Okay, Mr. Bakke, three minutes for some of the new points that Mr. Haug mentioned. Okay, thank you, your honor. I'll start with damages. If you take a look at the 17.78% returned by the jury, applying the right height standard, it was not so outrageously high as to be unsupportable. Clearly, what the jury got, and the district court recognized this, is that our expert, Dr. O'Donkey, performed a substantial analysis to determine the end point. Counsel, is this your rebuttal argument? No, I gave him a few more minutes because we allowed Mr. Haug to raise his point on his rebuttal. I understand. Thank you. I'm sorry. So, what I was saying is that the district court recognized that Dr. O'Donkey performed a substantial analysis to determine the end point. And when you look at what the facts are that came in here, and they're set out on page 59 of our brief in detail, but you had two parties who were fierce competitors. Bayer did not give licenses to competitors. Bayer was trying to market its own extended half-life product, and Beck-Salta was desperate to launch a Dynavate, a product that's called its flagship. So, if you look at that 17.78, which is at the low end of Dr. O'Donkey's range, you can see that the jury did the hard work of assessing all of the evidence, which is all it really needs to do. Indeed, under the Powell case, this court has determined that giving the jury a range is just fine. And in fact, in other cases, such as Apple, Smith, Klein, and Fujifoto, this court has determined that a jury can come to a reasonable royalty on their own, based on the record as a whole, and even reject both experts' rates. So, that's exactly what the jury did here. Dr. O'Donkey testified for some 60 pages of transcript, as opposed to their expert, Dr. Rauser, who gave very brief testimony, some 20 pages. And so, it's very clear that there was substantial evidence supporting the jury's damages verdict. If I could just mention something about enablement, because Mr. Howe went into great detail on enablement, which he didn't get into in his earlier remarks. This was a time trial, and they decided that they were not going to put in much evidence at all on enablement. I have to make decisions on how to allocate my time in a jury trial. We had 14 hours, and I don't have to address an issue, like here, enablement, that they did not put any evidence in, that was all conclusory in nature. We did anyway, and I referenced Dr. Plough's testimony, and there was other testimony from our experts saying that they failed in their burden. And so, I urge the court to reject their appeal on that basis alone. Okay. Thank you, Mr. Badke. Now, Mr. Howe, can you use one minute, can you use one minute limited to the damages aspect? Yes. Thank you, Your Honor. Once again, what happened is Mr. Adonke gave an opinion that the reasonable royalty would be 23.75%, which was the midpoint between what he said was the bargaining range, which went from 5% to 42.4%. But that's not what the jury selected. Correct. That's not what the jury did. And so, what happened was in Adalbert, his 23.75% royalty was kicked out. He was not allowed to testify to that because it didn't have any proper basis in the record. But the important thing is the bargaining range was not a range of reasonable loyalties. And in his deposition, which is in the record here, he clearly said that it would not be a reasonable loyalty to go to 42%, for example. It was a bargaining range. And he said, you go in the middle. What then happened when that got excluded, he then said to the jury, this bargaining range is a feasible range to pick any reasonable royalty you want. And that's what was argued to the jury. And they were given no basis for what they came up with, which was 17.78. That number appears nowhere. And we were not allowed to cross-examine Dr. Adanki about the opinion he gave in his report, namely the midpoint being the reasonable royalty. We could not cross-examine him on that. So, we couldn't go to his credit. We couldn't show his credibility or test his credibility on the basis of giving an opinion in his report, which was completely different from what he gave at trial. And we were not able to get into what really happened here. All right. I think we've... Thank you. ...exceeded some of the issues. Any more questions from the panel? No, thank you. No, thank you. All right. Thank you, Your Honor. Thank you. And thanks to counsel. This case is taken under submission. And that concludes this panel's argued cases for this panel. The Honorable Court is adjourned until tomorrow morning at 10 a.m.